811 P.2d 832

Ronald R. ISAAK and Ethelene M. Isaak, husband and wife, Plaintiffs–Appellants,

v.

IDAHO FIRST NATIONAL BANK, an Idaho corporation; Haney Seed Company, a Delaware corporation; Harry F. LeMoyne and Alice I. LeMoyne, husband and wife; Henri LeMoyne and Sharon LeMoyne, husband and wife; Jeffrey L. Sherburne and Deborah G. Sherburne, husband and wife; and Greg Ruddell and Cheryl Ruddell, husband and wife, Defendants–Respondents.

Idaho First National Bank, an Idaho corporation; Haney Seed Company, a Delaware corporation, Cross–Claimants,

Harry F. LeMoyne and Alice I. LeMoyne, husband and wife; Henri LeMoyne and Sharon LeMoyne, husband and wife; Jeffrey L. Sherburne and Deborah G. Sherburne, husband and wife; and Greg Ruddell and Cheryl Ruddell, husband and wife, Cross–Defendants.

No. 18616.

Supreme Court of Idaho, Boise, December 1990 Term.

April 9, 1991.

Rehearing Denied June 25, 1991.

Lloyd J. Walker, Twin Falls, for plaintiffs-appellants.

Holland & Hart, Langroise, Sullivan, Boise, for defendant-respondent, Idaho First Nat. Bank. John C. Ward argued.

Smith & Beeks, Twin Falls, for defendants-respondents LeMoyne, et al. Paul M. Beeks argued.

JOHNSON, Justice.

This is a real estate mortgage case in which the mortgagees agreed to substitute a renegotiated note for the original note secured by the mortgage. The renegotiated note provided that the mortgagor would not be personally liable to the mortgagees if a default in the payment of the note occurred and that the only remedy of the mortgagees in the event of default would be to proceed against the real estate described in the mortgage.

The dispositive issues raised in this appeal are whether the renegotiated note was unenforceable because (1) there was no consideration for its execution, (2) it was executed under financial duress, or (3) its execution was induced by fraud. We affirm the decision of the trial court that the renegotiated note was enforceable.

## I.

### THE BACKGROUND AND PRIOR PROCEEDINGS.

In 1980, Ronald and Ethelene Isaak (the Isaaks) sold their farm (the farm) to Haney Seed Company (Haney) for $860,000.00. Haney made a down payment of $240,000.00 to the Isaaks and executed a promissory note (the original note) for $620,000.00 payable to the Isaaks. The original note was secured by a mortgage (the mortgage) on the farm and required annual payments to the Isaaks of $66,204.52 on November 1 of each year commencing with 1981. Haney made these payments in 1981, 1982, and 1983. The original note recited that the amount of the note included an obligation of the Isaaks to the Federal Land Bank of Spokane secured by a mortgage that was prior and superior to the mortgage securing the original note.

In 1982, because of Haney's financial difficulties, the stockholders of Haney turned the control and management of Haney over to the Idaho First National Bank (the bank). At that time, Haney owed the bank more than $8,000,000.00. The bank appointed a board of directors (the board) for Haney composed of officers of the bank. Haney continued to operate and continued to borrow money from the bank.

In September 1984, the board directed Haney's attorney to notify the Isaaks that Haney would terminate its farming operations at the end of the 1984 crop year and that Haney would not make the payment due on November 1, 1984, as provided in the original note.

In October 1984, the Isaaks and their attorney met with Haney's attorney. Haney's attorney informed the Isaaks and their attorney that the farm was being listed for sale but would be tendered back to the Isaaks by deed in lieu of foreclosure if no sale occurred on or before November 1, 1984.

Harry and Alice LeMoyne, Henri and Sharon LeMoyne, and Jeffrey and Deborah Sherburne (the LeMoyne group) learned that Haney was going to tender the farm back to the Isaaks and obtained an option which would allow them to purchase the farm from Haney before midnight on November 1, 1984. At a meeting in late October 1984, the LeMoyne group informed the Isaaks that the LeMoyne group would purchase the farm from Haney on a non-recourse basis only, precluding liability in the event of a default.

In order to facilitate the sale of the farm by Haney to the LeMoyne group, the Isaaks agreed that a new note (the renegotiated note) signed by Haney would be substituted for the original note. The renegotiated note was dated November 1, 1984, and obligated Haney to pay the Isaaks $607,628.96. The payments on the renegotiated note were to be $66,204.52, payable on November 1 of each year beginning with 1985. In a separate agreement, Haney agreed to pay $39,531.31 directly to the Federal Land Bank of Spokane. The Isaaks agreed that this would constitute payment in full of the November 1, 1984 payment called for in the original note.

On December 7, 1984, the LeMoyne group purchased Haney's interest in the farm for $648,833.00. As part of this sale, the LeMoyne group agreed to assume the payment of the renegotiated note to the Isaaks. In December 1984, in order to

allow the Isaaks to meet some of their obligations, the LeMoyne group also paid $26,500.00 to the collection agent for the renegotiated note with instructions that this amount be transmitted to the Isaaks. Upon receipt of this payment, the collection agent—which also happened to be the bank—reduced the principal amount of the renegotiated note by $26,500.00.

After the LeMoyne group purchased Haney's interest in the farm, Jeffrey and Deborah Sherburne sold their interest in the farm to Greg and Cheryl Ruddell, who then became part of the LeMoyne group.

The LeMoyne group operated the farm during 1985. In December 1985, the LeMoyne group tendered to the Isaaks a deed to the farm in lieu of foreclosure. The Isaaks did not accept the deed. In January 1986, the Isaaks sued the bank, Haney, and the LeMoyne group seeking:

1.  foreclosure of the mortgage and a deficiency judgment against the bank and Haney based on the lack of payments provided for in the original note, as well as other defaults;

2.  a declaration that the renegotiated note was null and void for lack of consideration and mutuality and because it was the result of duress and fraud;

3.  judgment against the bank, Haney, and the LeMoyne group for $256,000.00, alleged to be the current value of the farm;

4.  $1,000,000.00 in punitive damages; and

5.  attorney fees.

The bank, Haney, and the LeMoyne group denied liability to the Isaaks. The bank and Haney cross-claimed against the LeMoyne group for any sums for which the bank and Haney were found to be liable to the Isaaks.

Following a court trial, the trial court entered judgment dismissing all of the claims of the Isaaks, and the Isaaks appealed. We initially assigned the case to the Court of Appeals, which affirmed the trial court's decision. The Isaaks petitioned this Court for review, which we granted.

II.

### THE ISAAKS FAILED TO PROVE LACK OF CONSIDERATION FOR THE RENEGOTIATED NOTE.

The Isaaks assert that the renegotiated note was not enforceable because it was not supported by consideration. We disagree.

The agreement to renegotiate the terms of the original note provided that the consideration for the renegotiated note was to be the payment by Haney of $39,531.31 to the Federal Land Bank of Spokane. The trial court concluded that the payment of this amount and the payment of $26,500.00 by the LeMoyne group to the Isaaks constituted valid consideration for the renegotiated note. The Isaaks argue that these amounts were already owed to them under the original note and, therefore, did not constitute consideration to support the renegotiated note.

While it is true that under the terms of the original note Haney was obligated to pay the Isaaks $66,204.52 on November 1, 1984, it is also true that this obligation could not have been enforced by a money judgment against Haney, unless in an action to foreclose the mortgage the trial court had determined that the reasonable value of the property was less than the mortgage indebtedness, plus costs of the foreclosure and sale. I.C. § 6–101 provides that a foreclosure action is the only action that is allowed for the recovery of a debt secured by a real estate mortgage. I.C. § 6–108 limits any deficiency judgment in a foreclosure action on a real estate mortgage to "the difference between the mortgage indebtedness, as determined by the decree, plus costs of foreclosure and sale, and the reasonable value of the mortgaged property, to be determined by the court in the decree upon the taking of evidence of such value."

Following the trial in this case, the trial court found that the fair market value of the farm as of December 7, 1984, was at least $648,833.00. This was the amount the LeMoyne group agreed to pay Haney

for the farm. While this value exceeded the amount that was owed to the Isaaks under the original note, the correct date for determining whether the Isaaks could have recovered a deficiency judgment against Haney was not December 7, 1984. No action for foreclosure was pending then. The correct date for determining the value of the farm would have been the date when the trial court in a foreclosure case determined whether a deficiency judgment should be entered pursuant to I.C. § 6–108. In *Eastern Idaho Prod. Credit Ass'n v. Placerton, Inc.*, 100 Idaho 863, 869, 606 P.2d 967, 973 (1980), the Court stated the purpose of this determination of value:

> [I.C. § 6–108] substitutes the fair market value of the property for the price at foreclosure sale as the amount to be deducted from the debt in order to fix the amount of the deficiency judgment. And it requires the district court to take the necessary evidence to determine the value of the property.

When the Isaaks brought an action in 1986 to foreclose the mortgage, they alleged that the reasonable value of the farm was $256,000.00 and that the amount due and owing on the original note as of January 1, 1986, was $648,042.00, with interest accruing at the rate of $166.41 per day. They sought a deficiency judgment of $428,042.00. When the trial was held in November 1987, the only evidence offered as to the value of the farm indicated that its value was not more than $245,000.00 at that time.

Only when evidence had been received of the value of the farm could the trial court have determined whether the Isaaks would have been entitled to a deficiency judgment against Haney. Although there was a delay of more than a year after the default by Haney on the November 1, 1984 payment before the Isaaks brought a foreclosure action, neither I.C. § 6–101 nor § 6–108 require a mortgagee to bring a foreclosure action immediately after a default. I.C. § 5–214A permits an action for the foreclosure of a real estate mortgage to be brought within five years of the date of maturity.

Nevertheless, the Isaaks had the burden to prove lack of consideration for the renegotiation of the original note. I.C. § 29–104; *Brand S Corp. v. King*, 102 Idaho 731, 733, 639 P.2d 429, 431 (1981); *Rosenberry v. Clark*, 85 Idaho 317, 324, 379 P.2d 638, 642 (1963). The Isaaks would have fulfilled this burden if they had proved that in making the payments to the Federal Land Bank of Spokane and to the Isaaks, Haney and the LeMoyne group did only what they were already bound to do by the terms of the original note. *Dashnea v. Panhandle Lumber Co.*, 57 Idaho 232, 238, 64 P.2d 390, 393 (1937); *Massey–Ferguson Credit Corp. v. Peterson*, 102 Idaho 111, 119–20, 626 P.2d 767, 775–76 (1980).

In late 1984, when Haney made the payment to the Federal Land Bank of Spokane and the LeMoyne group made the payment to the Isaaks, the Isaaks had not established that they were entitled to a deficiency judgment under I.C. § 6–108. Whether they could have instituted a foreclosure action and proved their right to a deficiency judgment is not germane. What is germane is that at the time these payments were made, the Isaaks had not established their right to a deficiency judgment. Therefore, they failed to carry their burden of proof that, in making these payments, Haney and the LeMoyne group were only doing what they were required to do at that time under the original note.

The trial court was correct in ruling that there was no lack of consideration for the renegotiated note.

### III.

BECAUSE THE ISAAKS HAD THE OPTION OF BRINGING AN ACTION TO FORECLOSE THE MORTGAGE AND SEEKING A DEFICIENCY JUDGMENT, THE ISAAKS WERE NOT ENTITLED TO THE DEFENSE OF ECONOMIC DURESS.

The Isaaks assert that the renegotiated note was null and void because they agreed to accept it as a substitute for the

original note due to financial duress. We disagree.

In its memorandum decision following the trial, the trial court stated that since the Isaaks "had an option to bring an action to foreclose the mortgage and resell the farm, there was not duress as a matter of law." In its findings of fact, the trial court found that the LeMoyne group told the Isaaks at a meeting in October 1984 that the LeMoyne group would only purchase the farm on a "non-recourse basis." The trial court concluded that after the Isaaks were informed by Haney's attorney that Haney would not make the payment due on November 1, 1984, as required under the terms of the original note, the Isaaks had the right to bring suit to foreclose the mortgage and seek a deficiency judgment or to request a deed in lieu of foreclosure.

In *Lomas & Nettleton Co. v. Tiger Enters., Inc.*, 99 Idaho 539, 585 P.2d 949 (1978), the Court adopted as the three elements of actionable duress: "(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party." *Id.* at 542, 585 P.2d at 952 (quoting *W.R. Grimshaw Co. v. Nevil C. Withrow Co.*, 248 F.2d 896, 904 (8th Cir.1957)).

In *Lomas & Nettleton* the Court also noted:

"Business compulsion is not established merely by proof that consent is secured by pressure of financial circumstances; or that one party insisted upon a legal right and the other party yielded to such insistence. Neither will a mere threat to withhold from a party a legal right which he has an adequate remedy to enforce, constitute duress. Generally, the demand by one party must be wrongful or unlawful, and the other party must have no other means of immediate relief from the actual or threatened duress than by compliance with the demand."

99 Idaho at 543, 585 P.2d at 953 (quoting *Inland Empire Refineries, Inc. v. Jones*, 69 Idaho 335, 339–40, 206 P.2d 519, 522 (1949)).

The Isaaks argue that the entire matter of duress turns around the letter written by Haney's attorney to the Isaaks on September 18, 1984. This letter stated:

Dear Mr. and Mrs. Isaak:

As you know, for some time now, the farming operations of Haney Seed Company conducted on the farm purchased from you on October 1, 1980, have been unsuccessful. It has been the case over past years, and it appears to be the case for the current crop year, that the landlord's share of the farming proceeds will be insufficient to discharge operating expenses and service debt. As a result of these unsuccessful operations, the company's bank has refused to renew its farm operating line of credit.

The company is unable to continue its farming business and will cease those operations effective the end of the 1984 crop year.

*Because of substantial operating losses, it will be impossible for the company to service its debt obligation to you.* The company has asked me to set up a conference with you and your attorney sometime during the week of October 8th. Hopefully, we will be able to arrange a mutually convenient time so that we may discuss these matters. Sometime within the next few days, my office will contact you and attempt to schedule a meeting time.

(Emphasis added).

The Isaaks point to the "economic impact" imposed on them as a result of the letter as the basis for seeking to set aside the renegotiation of the original note because of duress. Specifically, the Isaaks contend that out of the $66,240.52 due to them on November 1, 1984 under the original note, they had assigned $39,531.31 to the Federal Land Bank of Spokane and $26,500.00 to the Twin Falls Bank & Trust. The Isaaks also point out that they owed the Internal Revenue Service about $10,-000.00 and were being hounded for payment. The Isaaks argue that these circumstances and the failure of Haney to make

the November 1, 1984 payment placed tremendous economic duress on the Isaaks and that both Haney and the LeMoyne group used this duress for their own benefit. The Isaaks assert that the bank and Haney knew that the Isaaks lacked other sources of income with which to make the December 1, 1984 payment to the Federal Land Bank of Spokane and that the Isaaks would be automatically defaulted on that mortgage. The Isaaks also contend that Haney's offer to return the farm to them was meaningless, because they did not have the resources to operate the farm and would lose it to the Federal Land Bank of Spokane. The Isaaks eloquently plead:

> The financial embarrassment was not such that would cause a blush on one's cheeks. It was a financial condition that was devastating and insurmountable to the Isaaks. Forced foreclosure meant bankruptcy to the Isaaks.

The trial court did not gainsay the plight that confronted the Isaaks, nor do we. However, the Isaaks did have the legal options of accepting the tender of a deed from Haney in lieu of foreclosure or foreclosing on the mortgage and seeking a deficiency judgment. While these may not have been attractive alternatives to the Isaaks, under the standards for the proof of duress laid out in *Lomas & Nettleton,* these were other alternatives or means of relief.

We agree with the trial court that the Isaaks were not entitled to invoke duress as a defense to the renegotiated note.

## IV.

### THE ISAAKS FAILED TO CARRY THE BURDEN OF PROVING FRAUD BY CLEAR AND CONVINCING EVIDENCE.

■ The Isaaks assert that they proved that they were induced by the fraud of Haney and the bank to renegotiate the original note. We disagree.

The trial court concluded that the Isaaks failed to carry their burden of proving by clear and convincing evidence necessary elements required to support a fraud claim.

One of the elements the trial court concluded the Isaaks had not proved was that either Haney or the bank made a false representation.

In asking us to reject this conclusion, the Isaaks again refer to the letter from Haney's attorney in September 1984. They refer to the portion of the letter stating that Haney could not service its debt to the Isaaks and contend that this implies Haney was insolvent. The Isaaks argue that Haney was not insolvent because it regularly paid the bills it wanted to have paid for 1984 and thereafter. They also argue that the insolvency of Haney is irrelevant, because Haney which the bank owned, controlled, and operated, had ceased to exist, and that the bank was not insolvent. The Isaaks contend that the bank was capable of making the November 1, 1984 payment to them.

The trial court found that the bank "decided to keep Haney intact as a going business and to control its management and operation until it could be sold, by taking custody of 100% of the corporate stock of Haney, which was accomplished by an agreement [with Haney's stockholders]." The trial court also found that although the bank appointed a new board of directors for Haney, the bank and Haney "continued to operate as separate entities and to continue a debtor-creditor relationship." These findings are supported by substantial evidence in the record and, therefore, are not clearly erroneous.

The Isaaks put special emphasis on the contention that Haney had a line of credit from the bank of $3,500,000.00. The trial court found that when Haney's attorney wrote to the Isaaks on September 18, 1984: "Haney had borrowed at or near the maximum amount available to it pursuant to its credit line to purchase inventory, create accounts receivable, to operate its warehouse business and farms, including annual principal and interest payments on the purchase of the farms."

The testimony of an executive vice-president of the bank indicated that in 1984 Haney's credit line with the bank "was becoming tight." By November 1984, Ha-

ney owed the bank almost $3,400,000.00 on its operating line of credit—$277,000 of which was attributable to Haney's farming operations. During the 1984 crop year, Haney lost money on the operation of the farm.

Although by controlling and operating Haney, the bank was protecting its own interest in the several million dollars that Haney owed the bank, Haney continued as a separate entity and depended on the bank's approval of loan applications to continue operating. In a loan application dated November 26, 1984, Haney sought a $3,500,000.00 line of credit for the following year. This application stated that Haney's farm operations had been terminated and that the farm ground would be sold or turned back to the previous owners by way of deeds in lieu of foreclosure. The outstanding operating loans to Haney as of November 26, 1984 were $3,390,612.69. At the same time, Haney owed the bank $5,393,199.04 on other loans. On December 4, 1984, the bank approved an operating loan for Haney of $3,500,000.00, with the understanding that any advances over $3,000,000.00 had to be approved by the executive vice-president of the bank.

The statement in the letter of Haney's attorney to the Isaaks that it was impossible for Haney to service its debt obligation to the Isaaks was not false. Haney did not have funds to make the payment that was due on November 1, 1984. The bank was not obligated to pay the Isaaks, and, therefore, the bank's solvency was irrelevant. The trial court correctly concluded that Haney had failed to carry its burden of proving fraud by clear and convincing evidence.

### V.

### CONCLUSION.

Because we have concluded that the renegotiated note was not null and void, we find it unnecessary to address the Isaaks' contention that the bank was obligated on the original note and the mortgage.

We affirm the judgment of the trial court dismissing the claims of the Isaaks.

We award costs on appeal to the bank, Haney, and the LeMoyne group. The bank and Haney did not request attorney fees on appeal. The LeMoyne group requested attorney fees in its initial brief pursuant to I.C. § 12–121. We award no attorney fees to the LeMoyne group.

BAKES, C.J., and BISTLINE, BOYLE and McDEVITT, JJ., concur.